**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| RICHARD J. HEIMER, | ) | |
|    Plaintiff, | ) | **Jury Demanded** |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 3:25-cv-50250 |
| | ) | |
| CALEB BROWN, in his individual capacity; | ) | |
| EDGAR ALTAMIRANO, | ) | |
|    in his individual capacity; | ) | |
| SAM HAWLEY, in his individual capacity; | ) | |
| THOMAS FARONE, in his individual capacity; | ) | |
| PHILLIP HARRIS, in his individual capacity; and | | |
| THE VILLAGE OF ROSCOE; | ) | |
|    Defendants. | ) | |

## COMPLAINT

## PRELIMINARY STATEMENT

1.    In the early afternoon of October 26, 2003, Richard Heimer was at home with Jessica Heimer and their young son. Richard, Jessica and their son had previously done some shopping, returned home, and had some lunch. Richard and Jessica got their son situated so they could do some work around the home. Richard and Jessica then tried to remove an old washing machine from the laundry room.

2.    Richard had a valid Illinois FOID Card and an Illinois Concealed Carry Permit. Richard was carrying a handgun in a secure inside the waistband holster when he went shopping. Richard kept the handgun in the holster when he returned home.

3.    Richard turned off the water valves for the water lines going to the washing machine. When Richard disconnected the water lines, water poured out of the water lines. Richard handed the water lines to Jessica so he could try to turn off the water. Jessica

accidentally dropped the water lines and Richard bent down to pick them up. When Richard bent over, the handgun, while still in the holster, discharged. The bullet passed through an opening at the bottom of the holster and went through the back of Richard's pants. Richard's son was standing a few feet behind Richard in the hallway leading into the laundry room. The bullet hit Richard's son in the leg.

4. Richard and Jessica took their son out of the home to the front yard, and Richard applied a tourniquet while Jessica held their son and yelled for help. The tourniquet Richard applied quickly stopped the bleeding.

5. After the police arrived, they conducted a short investigation and arrested Richard for child endangerment. The investigation, however, failed to uncover any facts that could have supported charging Richard with child endangerment. The police investigation showed that Richard had a handgun in a holster in a half-cocked position. The police also learned that Richard was not touching the handgun when it discharged.

6. The police decided that simply carrying, in a holster, a handgun that discharged for some unknown reason constituted child endangerment. The subsequent bill of indictment alleged that Richard endangered the life or health of his son because Richard "carried a firearm half-cocked" around his son.

7. Both the Chief of Police for the Village of Roscoe (Sam Hawley) and the Deputy Chief of Police (Thomas Farone) came to Richard's home with the other officers. Defendant Hawley had overall control of the investigation and searches conducted by the police at the scene. Defendant Hawley and Defendant Farone unlawfully entered and searched Richard's home. The police subsequently obtained a warrant, without probable cause, and searched Richard's home again. As part of the search, the police seized, among other things, all of

2

Richard's firearms and ammunition. Defendant Hawley, Defendant Brown and Defendant Harris were involved in obtaining the warrant and search Richard's home and seizing his firearms.

8.     Without any basis whatsoever, felony charges of Reckless Discharge of a Firearm and Reckless Conduct were subsequently filed against Richard.

9.     The state submitted a bill of indictment to a grand jury.  The grand jury rejected the bill of indictment and returned it as "no true bill." The state subsequently dropped all charges against Richard.

## JURISDICTION AND VENUE

10.     This Complaint seeks remedies pursuant to 42 U.S.C. Sections 1983 and 1988, alleging violations of the Fourth, Second and Fourteenth Amendments to the Constitution of the United States of America, as well as the laws of the State of Illinois.

11.     Jurisdiction is conferred upon this Honorable Court pursuant to 28 U.S.C. Sections 1343 and 1367.

12.     Venue is proper before this Honorable Court pursuant to 28 U.S.C. Section 1391(b).

## Parties

13.     The Plaintiff Richard Heimer is an individual who currently resides at 11996 Baneberry Dr., Apt. 1D, Roscoe IL 61073.

14.     Defendant Sam Hawley was at all times relevant to this complaint the Chief of Police of the Roscoe Police Department. As Chief of Police, Defendant Hawley is the "head of the police department, shall have supervision of all members of the department who are on duty and shall be responsible for the proper management and conduct of the department." Further,

"[a]ll members of the police department shall, at all times during the performance of their duties, be subject to the direction and control of the police chief."

15. Defendant Edgar Altamirano was at all times relevant to this complaint a patrol officer for the Roscoe Police Department.

16. Defendant Caleb Brown was at all times relevant to this complaint a sergeant with the Roscoe Police Department.

17. Defendant Phillip Harris was at all times relevant to this complaint a detective with the Roscoe Police Department.

18. Defendant Thomas Farone was at all times relevant to this complaint the deputy police chief of the Roscoe Police Department.

19. Defendant Village of Roscoe is, and was at all times relevant to this complaint, a municipal corporation.

## ALLEGED FACTS

### A. The Underlying Incident

20. Richard Heimer and Jessica Heimer lived at 1058 Bitterroot Rd, #2, Roscoe, Illinois with their two children in October 2023. In October 2023, Richard's son was 2 years old, and his daughter was 11 years old.

21. October 26, 2023, was a school day, and Richard's oldest daughter was in school.

22. Richard's son, given his age, was not yet in school and was with Richard and Jessica.

23. Richard and Jessica had purchased a new washing machine and dryer prior to October 26, 2023, but had not yet installed these appliances.

4

24. In the late morning of October 26, 2023, Richard, Jessica and their son went to Walmart to get groceries and other household items.

25. At all relevant times, Richard had a valid Illinois FOID Card and an Illinois Concealed Carry Permit.

26. On October 26, 2023, Richard was carrying a Tisas 1911/A1 handgun in an inside the waistband holster. The holster was on Richard's right side and was connected to his belt by two belt clips that were connected to the holster. The two belt clip holster is a secure holster.

27. Richard's holster completely covered the handgun's trigger. The Tisas 1911/A1 handgun has multiple safeties.

28. The handgun was in a half-cocked position.

29. The owner's manual for the Tisas 1911/A1 states that the handgun's safety devices function when the handgun is carried in the half-cocked position.

30. When Richard and Jessica returned home with their son, they made lunch and got their son settled for the afternoon.

31. Richard and Jessica decided to remove the old washing machine and install the new washing machine.

32. When Richard disconnected the water lines from the old washing machine, water started pouring out of the water lines. There was a problem with the water valves that made turning off the water difficult.

33. Richard handed the water lines to Jessica while he tried to turn off the water. Jessica accidentally dropped the water lines.

34. Richard bent over to pick up the water lines and the handgun discharged.

35. Richard did not touch or hold the handgun when it discharged.

5

36. The bullet passed through the opening at the bottom of the holster and went through the back of Richard's pants.

37. The bullet struck Richard and Jessica's son in the leg. Richard's son was standing behind Richard in a hallway that connected the living area in the residence to the laundry room.

38. Richard removed the handgun from the holster, inspected the handgun and placed it on the floor of the laundry room.

39. As soon as Richard and Jessica learned that their son had been shot in the leg, they took him out of the house to the front lawn and Jessia yelled for help.

40. Jessica held their son as they both sat on the ground, while Richard applied a tourniquet to his leg. The bleeding quickly stopped after the tourniquet was applied.

41. Jessica asked a neighbor to call 911.

42. On information and belief, two neighbors called 911 to report that a woman was yelling and holding a child.

**B.      The Police Investigation At Richard's Home And His Arrest**

43. On information and belief, one of the first officers to arrive at the scene was Defendant Brown.

44. When Defendant Brown arrived at the scene, Jessica was holding her son and Richard was holding the tourniquet.

45. Defendant Brown quickly evaluated Richard and Jessica's son and noticed that the bleeding had stopped.

46. Defendant Brown did not question Richard at that time.

47. Defendant Brown did not question Richard or Jessica at any time prior to Richard's arrest.

48.    Defendant Brown did not examine Richard's clothing. If he had, he would have observed that there was a hole in the rear back pocket of Richard's pants.

49.    Defendant Brown interviewed two people at the scene who had called 911. Both individuals told Defendant Brown that they did not see or hear anything suspicious prior to their hearing Jessica yelling for help.

50.    Defendant Altamirano arrived shortly after Defendant Brown arrived. On information and belief, Defendants Hawley, Farone and Harris arrived shortly before or after Defendant Altamirano arrived at Richard's residence.

51.    When Defendant Altamirano arrived on the scene, Defendant Brown and the paramedics were providing medical assistance to Richard's son.

52.    Defendant Altamirano interviewed Richard soon after he arrived at the scene. During that interview, Richard explained that the handgun had discharged while in his holster. Richard showed Defendant Altamirano the holster, which Richard was still wearing. Defendant Altamirano observed a hole in the back of Richard's pants that was consistent with the handgun discharging while in Richard's holster.

53.    Richard removed his inside the waistband holster and left it on the ground after showing it to Defendant Altamirano.

54.    Richard told Defendant Altamirano that he did not know why the Tisas handgun discharged, but that he was not touching the handgun when it discharged.

55.    Defendant Altamirano took pictures of Richard's holster and pants during the interview. These pictures are separate and apart from any video taken by Defendant Altamirano's body camera, if he was wearing one.

7

56. Richard told Defendant Altamirano that he had left the handgun in the laundry room.

57. Defendant Altamirano did not interview Jessica.

58. After Defendant Altamirano interviewed Richard, he interviewed one of Richard's neighbors. On information and belief, the neighbor told Defendant Altamirano that he did not see or hear anything suspicious prior to hearing the sirens of the approaching officers.

59. After Defendant Altamirano completed interviewing Richard, Defendant Harris interviewed Richard.

60. As part of the investigation, Defendant Harris asked Richard to show him where the incident happened. Richard agreed to show Defendant Harris the laundry room where the incident occurred.

61. Richard took Defendant Harris into the garage and up a fight of steps that led to the laundry room. Richard showed Defendant Harris that the incident occurred in the laundry room close to a doorway that connected the laundry room to a hallway leading into the residence.

62. Richard explained to Defendant Harris that his son was standing in the hallway close to the entrance to the laundry room when the handgun discharged.

63. Richard was not facing his son when the handgun discharged.

64. When Richard and Defendant Harris entered the Laundry Room, Defendant Farone was in Richard's residence. Defendant Farone was standing in the hallway that led into the Laundry Room. Defendant Farone did not ask Richard for consent to enter his home, and Defendant Farone did not have a warrant to enter Richard's home.

65. On information and belief, Defendant Farone did not prepare a report documenting his activities at the scene.

66. Richard and Defendant Harris left the laundry room and returned to the front yard. When Richard and Defendant Harris left the laundry room, Defendant Farone was still in the hallway leading to the laundry room.

67. At some point after speaking with Defendant Harris, Defendant Altamirano approached Richard and asked if he would consent to a search of his home. Richard refused to consent to a search of his home.

68. Immediately after Richard refused to consent to a search of his home, Defendant Altamirano was instructed to arrest Richard for Endangering the Life or Health of a Child.

69. Defendant Altamirano arrested Richard. Richard was handcuffed and placed in a police vehicle.

70. The police had been at Richard and Jessica's residence for approximately 45 minutes prior to Richard's arrest.

71. Richard was taken to the Roscoe Police Station.

72. At the police station, the police seized Richard's clothing as evidence. The order to seize Richard's clothing was issued by Defendant Farone.

73. Defendant Altamirano inspected Richard's clothing, including his boxers. Defendant Altamirano observed that a burn mark was visible on Richard's boxers where the muzzle of the handgun would have been located when carried in Richard's holster.

74. There was no indication of a powder residue on the outer side of Richard's pants.

75. The police never tested Richard's hands for powder residue.

76. At the police station, Richard was told he was being charged with misdemeanor Child Endangerment.

77. Richard was placed in jail and held for 36 hours.

78.     Prior to his bond hearing, Richard was told he was being charged with Child Endangerment and felony Reckless Discharge of a Firearm.

## C.     The Protective Sweep

79.     Between the time the police initially arrived at Richard's residence and his arrest, Richard only entered the residence with Defendant Harris for a brief period of time.

80.     On information and belief, prior to Richard's arrest, Defendant Hawley and a deputy from the Winnebago County Sheriff's Department (Deputy Metzler), entered Richard's residence and conducted what Defendant Hawley called a protective sweep.

81.     Richard was not in the residence when the "protective sweep" occurred.

82.     Defendant Brown had not ordered Richard's arrest prior to the "protective sweep."

83.     A warrant for Richard's arrest had not been issued prior to the "protective sweep" being performed.

84.     While Defendant Hawley stated in his report that he "conducted a protective sweep of the interior of the residence" and identified Deputy Metzler as having accompanied him, Defendant Hawley makes no mention of Deputy Farone being in the residence or accompanying him on the "protective sweep."

## D.     The Interior Layout of Richard's Residence

85.     The old washing machine and dryer were located in a laundry room that was connected to the garage by a door and some stairs. Richard's apartment was on the second floor of the apartment complex. The staircase from the laundry room descended to the back of the garage, which was located on the ground floor. The laundry room had a second doorway that opened into a hallway that went into the home ("Laundry Room Hallway"). A bathroom was

located on the left side of the Laundry Room Hallway right after the doorway that opened into the laundry room.

86. One end of the Laundry Room Hallway ended at the doorway to the laundry room. At the other end of the Laundry Room Hallway were doorways to the apartment's two bedrooms.

87. The Laundry Room Hallway fed into a second hallway ("Living Room Hallway") that was connected to the Laundry Room Hallway in a right angle.

88. The Living Room Hallway led to the living room and dining room. A doorway off the Living Room Hallway on the right allowed access to the kitchen. The front door of the apartment was located in the living room.

**E.** **The Search Warrant And Seizure of Firearms, Ammunition and other Items**

**i.** **Defendant' Brown's Affidavit In Support of A Search Warrant**

89. After Richard's arrest, Defendant Brown prepared an affidavit ("Affidavit") seeking a warrant to search Richard's residence.

90. The only crime referenced in the Affidavit was Child Endangerment.

91. Defendant Brown did not provide any facts in the Affidavit that would indicate that Richard was carrying the Tisas handgun in a dangerous manner, or that Richard was touching the handgun when it discharged.

92. In the Affidavit, Defendant Brown asserts that Richard had stated that the "firearm was accidentally discharged from the holster while he was attempting to service a washing machine." There is nothing in the Affidavit to suggest that the incident occurred any place other than in the laundry room.

93. Defendant Brown stated that a protective sweep of the residence was conducted by Defendant Hawley, who saw in "plain view, several gun cases . . . a ballistic-style black vest containing an AR-15 style magazine."

94. Defendant Brown stated that he believed "other weapons and ammunition may still be in the residence." Richard had a valid FOID Card at the time and his possessing such firearms was lawful.

95. On information and belief, Defendant Brown knew that Richard had a valid FOID Card when he signed the Affidavit.

96. Defendant Brown did not state in the Affidavit that any crime was being committed by Richard possessing firearms and ammunition or a "ballistic-style black vest containing an AR-15 style magazine."

97. Defendant Brown did not explain how those items could constitute evidence for any alleged crime.

98. Other than alleging that Richard was carrying a handgun in a holster which discharged for some unstated reason, Defendant Brown did not provide any information that Richard posed a danger to anyone.

**ii. The Complaint for Search Warrant**

99. Defendant Brown was also the complainant in the Complaint for Search Warrant seeking a warrant to search Richard and Jessica's home.

100. The Complaint states that the police wanted to search for various things that "have been used in the commission of, or which may constitute the commission of the offense of Child Endangerment . . ."

101. The Complaint identifies a number of items, including, "firearms, ammunition, weapons, and any other items that may be associated with the crime of Child Endangerment."

102. There is no mention or even a suggestion that any weapons, other than the Tisas handgun, were involved in any criminal action by Richard. Nor are there any allegations or claims that it was unlawful for Richard to possess such firearms located in his home.

103. At the time the Complaint was prepared, Defendant Brown knew that Richard's son was shot after the Tisas handgun discharged.

**iii.    The Search Warrant and Search of Richard's Home**

104. A search warrant was issued on October 26, 2023, at 5:40 pm.

105. The search warrant called for the seizure of, among other things, any "firearms, ammunition, [and] weapons . . ."

106. Defendant Harris was given a copy of the search warrant. On information and belief, Defendant Harris was instructed to conduct a search of Richard's residence and to seize various items from Richard's residence.

107. At approximately 6:11 pm on October 26, 2023, Defendant Harris searched Richard's residence with Crime Scene Detective Suddarth.

108. The following items were seized from Richard's residence during the search: (a) a black nylon belt, (b) a black inside the pants holster, (c) a black magazine containing 8 rounds of .45 caliber ammunition, (d) the handgun Richard was carrying that discharged a round, (e) a tan ballistic vest with 5 AR-15 style magazines, (f) a black ballistic vest, (g) a Smith and Wesson handgun, (h) a Ruger AR-15 style rifle, (i) one rifle round (.308 Cal), (j) a bag containing "several" .223 cal. rounds, (k) 10 rounds of .45 cal. ammunition, (l) a black gun case for a .45 cal. handgun, (m) a black box with some cannabis, (n) several rounds of 7.62 ammunition, (o)

seven rounds of 12 gauge ammunition, (p) a "silver & gunmetal revolver" with a wooden handle, and (q) a bag or box with ammunition.

109.    Richard was not given a hearing prior to the seizure of the firearms, ammunition and magazines.

**F.    The Inadequate Police Investigation**

110.    Prior to Richard's arrest, Defendants Harris and Altamirano both had the opportunity to examine the holster Richard was wearing when the Tisas handgun discharged. Defendants Harris and Altamirano should have known that the holster Richard was wearing would completely cover the trigger when the handgun was placed in the holster.

111.    After Richard was arrested, he was taken to the Roscoe police station.

112.    At the police station, Richard was told to get undressed. A search of his clothing showed that there was a powder burn on Richard's underpants where the muzzle of the Tisas handgun would have been, if it was in the holster Richard was wearing.

113.    The holster Richard was carrying had a hard surface that completely covered the trigger.

114.    The bullet hole in the back of Richard's pants and the powder burn on his underpants showed that the Tisas handgun discharged in the holster and that Richard was not facing his son when the Tisas handgun discharged.

115.    On information and belief, the Defendants did no investigation into the safety features of the Tisas handgun Richard was carrying prior to arresting Richard.

116.    On information and belief, the Defendants did no investigation into what actually caused the Tisas handgun to discharge, other than the questions they asked Richard, prior to his arrest. On information and belief, the Defendants never conducted such an investigation.

117. On information and belief, the Defendants did no investigation into what safety features were engaged when the Tisas handgun discharged, prior to Richard's arrest. On information and belief, the Defendants never conducted such an investigation.

118. Defendants did no investigation into whether the Tisas handgun Richard was carrying had any defects, prior to his arrest. On information and belief, the Defendants never conducted such an investigation.

119. Defendants did not investigate Richard's understanding of the safety features of the Tisas handgun, prior to his arrest. Defendants never conducted such an investigation.

**G.**     **The Defendants' Investigation Did Not Reveal Probable Cause to Arrest Richard**

120. Prior to Richard's arrest, he was only interviewed by Defendant Altamirano and Defendant Harris. Defendant Brown, who ordered Defendant Altamirano to arrest Richard, had not interviewed Richard or Jessica. Richard was not interviewed by Defendant Hawley or Defendant Farone.

121. Defendant Altamirano's investigation consisted of his interviewing Richard and Michele L. Van Fleet, who is one of Richard's neighbors. Ms. Van Fleet told Defendant Altamirano that she had not heard anything suspicious prior to hearing sirens.

122. Defendant Brown told Defendant Altamirano that he had spoken to two individuals, neither of whom had heard anything suspicious prior to hearing Jessica yelling for help.

123. The information obtained by Defendant Altamirano and Defendant Harris did not create probable cause that Richard had committed any crime.

124. Neither Defendants Hawley or Brown personally collected sufficient information to create probable cause that Richard committed any crime in connection with the discharge of

the handgun. Nor did Defendant Brown collect sufficient information from Defendant Altamirano or Defendant Harris, when combined with the information Defendant Brown had personally collected, to show that probable cause existed to support charging Richard with Child Endangerment.

125. Prior to Richard's arrest, Defendants Hawley or Brown did not collect information from any source showing that probable cause existed that Richard committed any crime in connection with the discharge of the handgun.

126. Defendant Brown was speaking with Assistant State's Attorney Paulson prior to Defendant Brown ordering Defendant Altamirano to arrest Richard.

127. On information and belief, Defendant Brown told ASA Paulson during this call that Richard was handling the firearm in a manner that caused it to discharge. Any such statement by Defendant Brown to ASA Paulson would have been false.

128. The illegal search of Richard's home did not discover any evidence that would create probable cause that Richard committed any crime in connection with the discharge of his handgun.

## H. **Richard's Prosecution**

### i. **The Attempt To Keep Richard Incarcerated While Charges Were Pending, and The Charges Against Richard**

129. When Richard was arrested (a) Defendants were told that Richard was carrying his Tisas handgun in a holster, (b) Defendants Altamirano and Harris had inspected the holster and could easily determine that the trigger of the Tisas handgun would have been completely covered by the holster, (c) Defendants should have known that the Tisas handgun had multiple safeties, (d) Defendants were told that Richard was not touching or handling the Tisas handgun when it discharged and they had no evidence whatsoever to the contrary, (e) the witnesses

16

interviewed by Defendant Brown and Defendant Altamirano had not heard anything unusual going on in the residence before the police arrived, (f) Defendants had physical evidence that the Tisas handgun discharge while in the holster, given that a hole was found on the rear pocket of Richard's pants, (g) Defendants had physical evidence that Richard was not facing his son when the handgun discharged, (h) Defendants did not have facts showing that Richard was aware his son was standing behind him when the handgun discharged, and (i) Defendant Hawley knew that water was pouring out of the water lines for the washing machine and that he was unable to turn off the water.

130.    On October 23, 2023, the State of Illinois filed against Richard a Petition to Deny Pretrial Release. In the Petition, the State argued that Richard posed a "real and present threat to the safety of any person or persons or the community," and that Richard was being charged with Reckless Discharge of a Firearm.

131.    A hearing on the State of Illinois' Petition to Deny Pretrial Release was held on October 27, 2023. At the hearing, the court rejected the state's claim that it had met, by clear and convincing evidence, its burden of proving that Richard posed a threat to anyone.

132.    On October 27, 2023, the court entered an initial Conditions of Pretrial Release Order. In the October 27, 2023 Conditions of Pretrial Release, Richard was ordered, among other things, to "[r]efrain from possessing a firearm or other dangerous weapon," and to "[s]urrender FOID/Concealed carry license to Pre-trial services [and] Firearms, Ammo shall remain in custody or law enforcement while the case is pending."

133.    On October 30, 2023, the court entered a Notice of Conditions of Pretrial Release Upon Release from Custody that largely repeated the conditions in the October 27, 2023 Conditions of Pretrial Release.

134.     On October 27, 2023, the State of Illinois filed an Information against Richard, which contained two charges: (a) Reckless Discharge of a Firearm (felony), and (b) Endangering the Life or Health of a Child (misdemeanor) .

135.     With respect to the Reckless Discharge of a Firearm charge, the State of Illinois alleged that Richard "discharged a firearm in a reckless manner endangering the bodily safety of minor child J.H."

136.     With respect to the charge of Endangering the Life or Health of a Child, the State of Illinois claimed that Richard "knowingly caused or permitted the life or health of a child . . . to be endangered."

**ii.     The Charges Against Richard Were Not Supported By Probable Cause**

137.     Richard was arrested for misdemeanor Child Endangerment.

138.     On October 27, 2023, the day after the incident, Detective Harris contacted ASA Hanley and advised him as to the findings of the search warrant.

139.     Neither Defendant Brown nor Defendant Harris had information that would create probable cause that Richard committed a crime in connection with the discharge of his handgun.

140.     On information and belief, based on the false and/or misleading information provided to State prosecutors, Richard was later charged with: Reckless Discharge of a Firearm (720-5/24-1.5), and Reckless Discharge (720 ILCS 5/12-5(a)(2)).

141.     Neither of these charges was supported by probable cause.

142.     There was no evidence that Richard was carrying his handgun in an inappropriate manner.

143.     There was no evidence that Richard was holding or handling his handgun when it discharged.

### iii.     The Dismissal of The Charges Against Richard

144.    The State of Illinois prepared an indictment against Richard, accusing him of Reckless Discharge of a Firearm, Reckless Conduct, and Endangering The Life or Health of a Child (720-5/12C-5(a)).

145.    In Count 1 of the Bill of Indictment, the State accused Richard of Reckless Discharge of a Firearm. Count 1 alleges, that Richard "discharged a firearm while inside a room . . ." Carrying a firearm in a holster that covers the trigger cannot constitute Reckless Discharge of a Firearm, if that firearm discharges.

146.    No facts supported the claim that Richard discharged the Tisas handgun. On information and belief, Defendants Brown and Harris falsely represented to the States Attorney's Office that Richard was handling the Tisas handgun when it discharged.

147.    In Count 2 of the Bill of Indictment, the State accused Richard of Reckless Conduct. The State claimed that Richard "moved a washing machine while carrying a half-cocked firearm in a holster while [his son] was nearby . . ." Carrying a firearm in a holster that covers the trigger around a child does not constitute Reckless Conduct. On information and belief, Defendants Brown and Harris falsely represented to the States Attorney's Office that Richard was moving a washing machine when the Tisas firearm discharged. On information and belief, Defendants Brown and Harris falsely represented to the States Attorney's Office that Richard was handling the Tisas handgun when it discharged.

148.    In Count 3 of the Bill of Indictment, the State accused Richard of Endangering the Life or Health of a Child. The State alleged that Richard "carried a firearm half-cocked around J.H." Carrying a firearm in a holster that covers the trigger around a child does not constitute Endangering the Life or Health of a Child. On information and belief, Defendants Brown and

19

Harris falsely represented to the States Attorney's Office that Richard was moving a washing machine when the Tisas handgun discharged. On information and belief, Defendants Brown and Harris falsely represented to the States Attorney's Office that Richard was handling the Tisas handgun when it discharged.

149.    The grand jury "returned a no true bill of indictment."

150.    A "no true bill of indictment" indicates that the grand jury determined that probable cause did not exist to support the charges against Richard.

151.    The State subsequently moved to have all of the charges against Richard dismissed.

152.    On June 4, 2024, all charges against Richard were dismissed.

## I.    DCFS' Involvement

153.    On information and belief, while the police were still at Richard's home, Defendant Altamirano called DCFS and notified DCFS about the incident.

154.    On information and belief, Defendant Brown directed Defendant Altamirano to contact DCFS.

155.    Richard's son was first brought for treatment to Javon Bea Hospital in Loves Park, Illinois. Jessica went with her son to the hospital.

156.    The son's care team wanted Richard and Jessica's son transferred to UW Health/Madison of Wisconsin Children's Hospital ("Children's Hospital"). He was transferred by ambulance to Children's Hospital, and Jessica accompanied him.

157.    Two representatives from DCFS came to Children's Hospital. On information and belief, at Children's Hospital, the DCFS representatives were told there was no indication of abuse.

20

158. The DCFS representatives demanded that Jessica leave Children's Hospital and her son. They also demanded that she sign a safety plan.

159. Jessica signed a safety plan that required both of her children to reside with Richard's parents.

160. Richard is not aware of DCFS ever completing an investigation into the matter.

161. Richard is not aware of DCFS ever determining that abuse was indicated.

162. The safety plan was terminated and Richard and Jessica moved in with Richard's parents.

**J.     Defendants' Action Cause Richard Significant Emotional Trauma**

163. Richard suffered extreme emotional distress from his arrest, the illegal searches of his home, the removal of his children from their home, and his subsequent prosecution.

164. Richard's arrest separated him from his son at a critical time. Richard was not able to look after his son and work with Jessica to ensure that their son received proper medical care. Nor was Richard able to care for and comfort his son.

165. Richard was then accused without any basis for criminally harming his son, which caused Richard significant emotional distress.

166. Richard was also subjected to months of criminal prosecution, which included the prosecution of two felony counts. The criminal prosecution and the resulting stress caused Richard added emotional distress.

167. The criminal prosecution and the resulting stress also caused Richard physical problems given his diabetes. The physical problems increased Richard's emotional distress.

168. On information and belief, Richard and Jessica were forced by the landlord to leave their residence as a result of his arrest.

169. Press reports concerning the incident repeated the claim that Richard had criminally injured and endangered his son. The press releases caused Richard to suffer embarrassment and additional emotional distress.

**COUNT I**
**42 U.S.C. Section 1983**
**(Defendants Hawley, Brown and Altamirano)**
**(False Arrest/Unreasonable Seizure Under The Fourth Amendment)**

170. Richard incorporates Paragraphs 1 through 169, above, by reference, as if fully rewritten herein.

171. Defendants Hawley, Brown and Altamirano, at all times relevant to this action, were acting under color of state law.

172. Defendants Hawley, Brown and Altamirano unlawfully arrested and seized Plaintiff without probable cause or a warrant in violation of the Fourth and Fourteenth Amendments to the Constitution of the United States.

173. Defendant Hawley was in overall charge of the scene when Richard was arrested.

174. Defendant Brown ordered Richard's arrest.

175. Defendant Altamirano arrested Richard pursuant to an illegal order issued by Defendant Brown.

176. Defendants Hawley, Brown and Altamirano intended to confine and seize Richard.

177. Defendants Hawley, Brown and Altamirano' actions were not taken in good faith and were in violation of clearly established law.

178. As a direct and proximate result of Defendants Hawley, Brown and Altamirano' unreasonable and unlawful actions, Richard has suffered damages for the violation of his constitutional rights.

22

179. Defendants Hawley, Brown and Altamirano' actions were motivated by an evil motive or intent against Richard, or involved a "callous indifference to the federally protected rights" of the Plaintiff.

WHEREFORE, Plaintiff, Richard Heimer, seeks a judgment against Defendants Hawley, Brown and Altamirano, for:

a. Compensatory damages for the violation of his constitutional rights and the emotional distress caused by their actions;

b. Punitive damages to the fullest extent permitted by law;

c. Prejudgment and post-judgment interest;

d. Declare that the Defendants' actions violated the Fourth and Fourteenth Amendments to the United States Constitution;

e. Costs incurred in this action and reasonable attorney's fees under 42 U.S.C. Section 1988; and

f. Such other and further relief as may become apparent from discovery in this matter.

**COUNT II**
**42 U.S.C. Section 1983**
**(Defendant Hawley)**
**<u>(Unlawful Search of Richard's Home (protective sweep) Under the Fourth Amendment)</u>**

180. Richard incorporates Paragraphs 1 through 169, above, by reference, as if fully rewritten herein.

181. Defendant Hawley, at all times relevant to this action, was acting under color of state law.

182. Without a warrant, Defendant Hawley entered and unlawfully searched Richard's home. No justification existed for Defendant Hawley's search of Richard's home without a warrant.

183. Defendant Hawley did not have probable cause to search Richard's home.

184. Exigent circumstances did not exist that would have supported the search of Richard's home without a warrant.

185. Defendant Hawley did not have a basis to search Richard's home without a warrant under the protective sweep doctrine.

186. Defendant Hawley's actions were not taken in good faith and were in violation of clearly established law.

187. As a direct and proximate result of Defendant Hawley's unreasonable and unlawful actions, Richard has suffered damages for the violation of his constitutional rights.

188. Defendant's actions were motivated by an evil motive or intent against Richard, or involved a "callous indifference to the federally protected rights" of the Plaintiff.

WHEREFORE, Plaintiff, Richard Heimer, seeks a judgment against Defendant Hawley for:

a. Compensatory damages for the violation of his constitutional rights and the emotional distress caused by his actions;

b. Punitive damages to the fullest extent permitted by law;

c. Prejudgment and post-judgment interest;

d. Declare that the Defendant's actions violated the Fourth and Fourteenth Amendments to the United States Constitution;

24

e.    Costs incurred in this action and reasonable attorney's fees under 42 U.S.C. Section 1988; and

f.    Such other and further relief as may become apparent from discovery in this matter.

## COUNT III
## 42 U.S.C. Section 1983
### (Defendant Farone)
### (Unlawful Search of Richard's Home Under the Fourth Amendment)

189.    Richard incorporates Paragraphs 1 through 169, above, by reference, as if fully rewritten herein.

190.    Defendant Farone, at all times relevant to this action, was acting under color of state law.

191.    Without a warrant, Defendant Farone entered and unlawfully searched Richard's home. No justification existed for Defendant Farone's search of Richard's home without a warrant.

192.    Defendant Farone did not have probable cause to search Richard's home.

193.    Exigent circumstances did not exist that would have supported the search of Richard's home without a warrant.

194.    Defendant Farone's actions were not taken in good faith and were in violation of clearly established law.

195.    As a direct and proximate result of Defendant Farone's unreasonable and unlawful actions, Richard has suffered damages for the violation of his constitutional rights.

196.    Defendant's actions were motivated by an evil motive or intent against Richard, or involved a "callous indifference to the federally protected rights" of the Plaintiff.

WHEREFORE, Plaintiff, Richard Heimer, seeks a judgment against Defendant Farone for:

a.	Compensatory damages for the violation of his constitutional rights and the emotional distress caused by his actions;

b.	Punitive damages to the fullest extent permitted by law;

c.	Prejudgment and post-judgment interest;

d.	Declare that the Defendant's actions violated the Fourth and Fourteenth Amendments to the United States Constitution;

e.	Costs incurred in this action and reasonable attorney's fees under 42 U.S.C. Section 1988; and

f.	Such other and further relief as may become apparent from discovery in this matter.

**COUNT IV**
**42 U.S.C. Section 1983**
**(Defendants Harris and Brown)**
**(Unlawful Search of Richard's Home Under the Fourth Amendment)**

197.	Richard incorporates Paragraphs 1 through 169, above, by reference, as if fully rewritten herein.

198.	Defendants Harris and Brown, at all times relevant to this action, were acting under color of state law.

199.	Defendant Brown signed an affidavit supporting the complaint seeking a search warrant allowing the search of Richard's home, and was the complainant in that complaint.

200.	The affidavit did not provide facts showing probable cause that Richard committed any crime. Defendant Brown misleadingly represented that Richard caused an accidental discharge of his handgun. No facts supported Defendant Brown's suggestion.

201. No probable cause existed to support the issuance of a warrant to search Richard's home.

202. Defendants Brown and Harris' actions were not taken in good faith and were in violation of clearly established law.

203. As a direct and proximate result of Defendants Brown and Harris' unreasonable and unlawful actions, Richard has suffered damages for the violation of his constitutional rights.

204. Defendants Brown and Harris' actions were motivated by an evil motive or intent against Richard, or involved a "callous indifference to the federally protected rights" of the Plaintiff.

WHEREFORE, Plaintiff, Richard Heimer, seeks a judgment against Defendants Harris and Brown for:

a. Compensatory damages for the violation of his constitutional rights and the emotional distress caused by their actions;

b. Punitive damages to the fullest extent permitted by law;

c. Prejudgment and post-judgment interest;

d. Declare that the Defendants' actions violated the Fourth and Fourteenth Amendments to the United States Constitution;

e. Costs incurred in this action and reasonable attorney's fees under 42 U.S.C. Section 1988; and

f. Such other and further relief as may become apparent from discovery in this matter.

**COUNT V**
**42 U.S.C. Section 1983**
**(Defendants Brown and Harris)**
**(Malicious Prosecution Under The Fourth Amendment)**

205.    Richard incorporates Paragraphs 1 through 169, above, by reference, as if fully rewritten herein.

206.    Defendants Brown and Harris, at all times relevant to this action, were acting under color of state law.

207.    Defendants Brown and Harris played integral roles in Richard's arrest and subsequent prosecution given their access and control of the information provided to state prosecutors.

208.    As a direct and proximate result of statements and information provided by Defendants Brown and Harris to local prosecutors, a criminal proceeding was initiated and continued against Richard.

209.    The charges brought against Richard were not supported by probable cause.

210.    The State of Illinois sought an indictment against Richard, and Defendant Harris testified before the grand jury.

211.    The grand jury refused to issue an indictment.

212.    After the grand jury refused to issue an indictment, the state dismissed the criminal charges against Richard and the criminal proceeding was terminated.

213.    The criminal proceeding against Richard was brought with malice and bad faith.

214.    Richard suffered regular and special damages as a result of the malicious prosecution.

215.    Richard's prosecution resulted in his being arrested, searched, detained, subjected to conditions of pretrial release and a criminal prosecution.

28

216. Defendants Brown and Harris' malicious prosecution of Richard violated Richard's rights under the Fourth and Fourteenth Amendments to the United States Constitution.

217. As a direct and proximate result of Defendants' unreasonable and unlawful actions, Richard has suffered damages for the violation of his constitutional rights.

218. Defendants' actions were motivated by an evil motive or intent against Richard, or involved a "callous indifference to the federally protected rights" of the Plaintiff.

WHEREFORE, Plaintiff, Richard Heimer, seeks a judgment against Defendants Brown and Harris for:

a. Compensatory damages for the violation of his constitutional rights and the emotional distress caused by their actions;

b. Punitive damages to the fullest extent permitted by law;

c. Prejudgment and post-judgment interest;

d. Declare that the Defendants' actions violated the Fourth and Fourteenth Amendments to the United States Constitution;

e. Costs incurred in this action and reasonable attorney's fees under 42 U.S.C. Section 1988; and

f. Such other and further relief as may become apparent from discovery in this matter.

**COUNT VI**
**42 U.S.C. Section 1983**
**(Defendants Brown and Harris)**
**(Violation of Richard's Fourth Amendment Rights)**

219. Richard incorporates Paragraphs 1 through 169, above, by reference, as if fully rewritten herein.

220. Defendants Brown and Harris, at all times relevant to this action, were acting under color of state law.

221. Defendant Brown was the complainant in the Complaint for Search Warrant that expressly called for the seizure of Richard's firearms and ammunition.

222. Defendant Brown had no probable cause, nor any reason to claim, that Richard's firearms were used in the commission of any crime or that Richard's possessing such firearms could constitute a crime.

223. Defendants Brown and Harris knew when the Complaint for Search Warrant was prepared and filed that only the Tisas handgun was involved in the incident for which Richard was charged with child endangerment.

224. Defendants Brown and Harris knew that a rifle was not involved in the incident.

225. Defendants Brown and Harris knew that the ammunition at Richard's home was not involved in the incident.

226. Defendants Brown and Harris knew that ballistic vests were not involved in the incident.

227. Defendant Harris conducted the search and seizure of firearms, ammunition and ballistic vests from Richard's home.

228. Defendants' seeking the seizure of Richard's firearms, ammunition and ballistic vests, and the subsequent seizure of those items was not supported by probable cause and violated Richard's rights under the Fourth and Fourteenth Amendments of the United States Constitution.

229. As a direct and proximate result of Defendants' unreasonable and unlawful actions, Richard has suffered damages for the violation of his constitutional rights.

230. Defendants' actions were motivated by an evil motive or intent against Richard, or involved a "callous indifference to the federally protected rights" of the Plaintiff.

WHEREFORE, Plaintiff, Richard Heimer, seeks a judgment against Defendants Brown and Harris for:

a.     Compensatory damages for the violation of his constitutional rights and the emotional distress caused by their actions;

b.     Punitive damages to the fullest extent permitted by law;

c.     Prejudgment and post-judgment interest;

d.     Declare that the Defendants' actions violated the Fourth and Fourteenth Amendments to the United States Constitution;

e.     Costs incurred in this action and reasonable attorney's fees under 42 U.S.C. Section 1988; and

f.     Such other and further relief as may become apparent from discovery in this matter.

**COUNT VII**
**42 U.S.C. Section 1983**
**(Defendants Brown and Harris)**
**(Violation of Richard's Second Amendment Rights)**

231. Richard incorporates Paragraphs 1 through 169, above, by reference, as if fully rewritten herein.

232. Defendants Brown and Harris, at all times relevant to this action, were acting under color of state law.

233. The Second Amendment to the United States Constitution commands that the "right of the people to keep and bear Arms, shall not be infringed."

234. Defendant Brown was the complainant in the Complaint for Search Warrant that expressly called for the seizure of Richard's firearms and ammunition.

235. Defendant Brown had no probable cause nor any reason to claim that Richard's firearms were used in the commission of any crime or that Richard's possessing such firearms could constitute a crime.

236. Defendants Brown and Harris knew when the Complaint for Search Warrant was prepared and filed that only the Tisas handgun was involved in the incident for which Richard was charged with child endangerment.

237. Defendants Brown and Harris knew that a rifle was not involved in the incident. The rifle seized by Defendants was a protected arm under the Second Amendment.

238. Defendants Brown and Harris knew that the ammunition at Richard's home was not involved in the incident. The ammunition seized by Defendants were protected arms under the Second Amendment.

239. Defendants Brown and Harris knew that ballistic vests were not involved in the incident. The ballistic vests were protected arms under the Second Amendment.

240. Defendant Harris conducted the search and seizure of firearms, ammunition and body armor from Richard's home.

241. At the time the firearms, ammunition and body armor were seized, Richard was not under indictment for any crime.

242. Richard was not given any due process prior to the seizure of the firearms, ammunition and ballistic vests.

243. Defendants did not provide any facts in the Affidavit or the Complaint for Search Warrant that Richard posed any danger to himself or anyone else.

244. Defendants' seeking the seizure of Richard's firearms, ammunition and ballistic vests, and the subsequent seizure of those items constituted an infringement and violation of Richard's rights under the Second and Fourteenth Amendments of the United States Constitution.

245. As a direct and proximate result of Defendants' unreasonable and unlawful actions, Richard has suffered damages for the violation of his constitutional rights.

246. Defendants' actions were motivated by an evil motive or intent against Richard, or involved a "callous indifference to the federally protected rights" of the Plaintiff.

WHEREFORE, Plaintiff, Richard Heimer, seeks a judgment against Defendants Brown and Harris for:

a. Compensatory damages for the violation of his constitutional rights and the emotional distress caused by their actions;

b. Punitive damages to the fullest extent permitted by law;

c. Prejudgment and post-judgment interest;

d. Declare that the Defendants' actions violated the Second and Fourteenth Amendments to the United States Constitution;

e. Costs incurred in this action and reasonable attorney's fees under 42 U.S.C. Section 1988; and

f. Such other and further relief as may become apparent from discovery in this matter.

**COUNT VIII**
**42 U.S.C. Section 1983**
**(Defendant Village of Roscoe)**
**(Violation of Richard's Second and Fourth Amendment Rights)**

247. Richard incorporates Paragraphs 1 through 169, above, by reference, as if fully rewritten herein.

248. Defendant Hawley was the final decisionmaker for the Village of Rosco with respect to (a) the searches of Richard's home, (b) Richard's arrest, and (c) the malicious prosecution of Richard.

249. Defendant Hawley personally conducted an illegal search of Richard's home.

250. Defendant Hawley played a crucial role in obtaining the warrant for the search of Richard's home and the seizure of his firearms, ammunition and ballistic vests. On information and belief, Defendant Hawley made the final decision to seek the warrant and for the seizure of Richard's firearms, ammunition and ballistic vests.

251. Defendant Hawley, on information and belief, knew and approved of Defendant Farone's illegal search of Richard's home.

252. On information and belief, Defendant Hawley knew and approved Richard's arrest.

244. Defendant Hawley's decisions concerning the searches of Richard's home, the seizure of Richard's firearms, ammunition and ballistic vests, and Richard's arrest violated Richard's rights under the Second, Fourth and Fourteenth Amendments of the United States Constitution.

245. As a direct and proximate result of Defendant Village of Rosoce's unreasonable and unlawful actions, Richard has suffered damages for the violation of his constitutional rights.

246. Defendant Village of Roscoe's actions were motivated by an evil motive or intent against Richard, or involved a "callous indifference to the federally protected rights" of the Plaintiff.

WHEREFORE, Plaintiff, Richard Heimer, seeks a judgment against Defendant Village of Roscoe for:

a. Compensatory damages for the violation of his constitutional rights and the emotional distress caused by their actions;

b. Punitive damages to the fullest extent permitted by law;

c. Prejudgment and post-judgment interest;

d. Declare that the Defendant's actions violated the Second and Fourteenth Amendments to the United States Constitution;

e. Costs incurred in this action and reasonable attorney's fees under 42 U.S.C. Section 1988; and

f. Such other and further relief as may become apparent from discovery in this matter.

## COUNT IX
### (Defendants Hawley, Brown and Altamirano)
### (False arrest – Illinois State Law)

247. Plaintiff incorporates Paragraphs 1 through 169, above, by reference as if fully rewritten herein.

248. Defendants Hawley, Brown and Altamirano unlawfully arrested and seized Richard without probable cause or a warrant.

249. Defendant Hawley was in charge of the scene when Richard was arrested, and was responsible for the actions taken by Defendants Brown and Altamirano.

250. Defendant Brown ordered Richard's arrest.

251. Defendant Altamirano arrested Richard pursuant to an illegal order issued by Defendant Brown.

252. Defendants Hawley, Brown and Altamirano intended to confine and seize Richard.

253. Defendants Hawley, Brown and Altamirano' actions were not taken in good faith and were in violation of clearly established law.

254. As a direct and proximate result of Defendants Hawley, Brown and Altamirano' unreasonable and unlawful actions, Richard has suffered damages.

255. Defendants Hawley, Brown and Altamirano' actions were motivated by an evil motive or intent against Richard, or involved a "callous indifference to the federally protected rights" of the Plaintiff.

WHEREFORE, Plaintiff, Richard Heimer, seeks a judgment against Defendants Hawley, Brown and Altamirano, for:

a. Compensatory damages for the violation of his constitutional rights and Illinois law and the emotional distress caused by their actions;

b. Punitive damages to the fullest extent permitted by law;

c. Prejudgment and post-judgment interest; and

d. Such other and further relief as may become apparent from discovery in this matter.

## COUNT X
### (Defendants Brown and Harris)
### (Malicious Prosecution – State Law)

256. Plaintiff incorporates Paragraphs 1 through 169, above, by reference, as if fully rewritten herein.

257. Defendants Brown and Harris played an important role in Richard's arrest and subsequent prosecution given their access and control of the information provided to state prosecutors.

258. As a direct and proximate result of statements and information provided by Defendants Brown and Harris to local prosecutors, a criminal proceeding was initiated and continued against Richard.

259. The charges brought against Richard were not supported by probable cause.

260. The State of Illinois sought an indictment against Richard, and Defendant Harris testified before the grand jury hearing the matter.

261. The grand jury refused to issue an indictment.

262. After the grand jury refused to issue an indictment, the state dismissed the criminal charges against Richard and the criminal proceeding was terminated.

263. The criminal proceeding against Richard was brought with malice and bad faith.

264. Richard suffered regular and special damages as a result of the malicious prosecution.

265. Richard's prosecution resulted in his being arrested, searched, detained, subjected to conditions of pretrial release and a criminal prosecution.

WHEREFORE, Plaintiff, Richard Heimer, seeks a judgment against Defendants Brown and Harris for:

a. Compensatory damages for Defendants' malicious prosecution of Richard and the emotional distress caused by their actions;

b. Punitive damages to the fullest extent permitted by law;

c. Prejudgment and post-judgment interest; and

        d.        Such other and further relief as may become apparent from discovery in this

matter.

Dated: June 6, 2025                          **Law Office Of George M. Sanders**

                                          By:    /s/ George M Sanders
                                          George M. Sanders
                                          77 W. Wacker Dr., Suite 4500
                                          Chicago, IL  60601
                                          312/624-7645 (tel)
                                          312/523-2001 (fax)
                                          gsanders@gmslaw.net
                                          Attorney No. 6220443

38